# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| _____ ) | |
| ) | |
| ANGELICA DAVILA, ) | |
| ) | |
| *Plaintiff*, ) | Civil Action No._____ |
| ) | |
| v. ) | (related to No. 2:13-cv-00070-MRH) |
| ) | |
| UNITED STATES OF AMERICA ) | |
| ) | |
| *Defendant*. ) | |
| ) | |
| _____) | |

## COMPLAINT

### INTRODUCTION

1.     Plaintiff Angelica Davila is a citizen of the United States.  Local and federal officials nonetheless collaborated to arrest and imprison her at the Allegheny County Jail as a suspected undocumented and deportable "alien."  Although these local and federal officials learned less than two hours after Davila's arrest that she was lawfully present in the United States, they took no immediate action to secure her release, causing her to spend an additional ten hours in jail.

2.     Plaintiff brings this action against Defendant United States of America under the Federal Tort Claims Act.

3.     This matter is brought as a related case to the previously filed action brought against local and federal officials, *Davila v. Northern Regional Joint Police Board* et al., under docket number 2:13-cv-00070.

## JURISDICTION AND VENUE

4.　　This Court has jurisdiction over the subject matter of this Complaint under 28 U.S.C. § § 1331 & 1346(b).

5.　　On January 15, 2013, Davila submitted an Administrative Tort Claim to ICE and the United States Department of Homeland Security. Plaintiff's claim was denied on July 24, 2013. Plaintiff has therefore exhausted all available administrative remedies.

6.　　Venue is properly within this District under 28 U.S.C. § 1402(b) as the acts that are the subject of this Complaint occurred within the District, in Allegheny County, Pennsylvania.

## PARTIES

7.　　Plaintiff Angelica Davila, 29, was at all times relevant to this Complaint a United States citizen and a resident of West Mifflin, Pennsylvania.

8.　　Brianna Tetrault, who was named as a defendant in the related case, No. 2:13-cv-70, and any and all other federal officers involved in the decisions to arrest Davila, issue an immigration detainer concerning Davila, and detain her in the Allegheny County Jail (collectively "ICE officers") were, at all times relevant to this Complaint, officers employed by ICE, an executive agency of the United States of America.

9.　　At all times relevant to this Complaint, the ICE officers were acting within the scope and course of their employment with ICE and, as such, Defendant United States of America is the appropriate defendant under the Federal Tort Claims Act.

10.　　At all times relevant to this Complaint, the ICE officers were acting as investigative or law enforcement officers.

## FACTUAL ALLEGATIONS

### Background

11.     Plaintiff Angelica Davila is a naturalized United States citizen who was born in Mexico on June 25, 1984.

12.     Davila's given name is Angelica Elizabeth Davila Garza, following the Spanish tradition of giving children the last names of both parents. She uses Davila as her last name.

13.     Davila legally immigrated to the United States from Mexico with her parents when she was two years old.

14.     Davila's father was born in Texas and is a United States citizen.

15.     Davila's mother became a United States citizen through naturalization in 1997.

16.     Davila became a lawful permanent resident on April 30, 2001, at the age of 16.

17.     Under Title I of the Child Citizenship Act of 2000, 8 U.S.C. § 1431, Davila automatically became a United States citizen when she received her permanent resident card on April 30, 2001.

18.     The Child Citizenship Act grants automatic citizenship to the minor children of U.S. citizen parents who are residing in the United States in the legal and physical custody of the citizen parent pursuant to a lawful admission for permanent residence.

19.     Davila applied for a Certificate of Citizenship on June 9, 2010. Her application was granted, and a Certificate of Citizenship was issued to her on December 20, 2011. The Certificate of Citizenship states that Davila became a citizen of the United States on April 30, 2001.

20.     Davila is a Hispanic woman of Mexican heritage.

21.     Davila speaks both English and Spanish.

22.     Davila moved to the Pittsburgh region in 2007.

23.     At all times relevant to this Complaint, Davila was employed by a well-known Pittsburgh-based company, where she has worked since 2009.

### Davila's Arrest

24.     On Saturday, January 22, 2011, Davila had dinner with her friend Joel Garrete at a restaurant on U.S. Route 19 in the Wexford area of Allegheny County, Pennsylvania.

25.     After dinner, Davila and Garrete drove to a Mexican grocery store, Los Campos, located at 11566 Perry Highway in Pine Township, Pennsylvania.

26.     At approximately 5:45 p.m., Davila and Garrete exited the Los Campos parking lot onto Perry Highway heading north.

27.     Davila, a licensed Pennsylvania driver, was driving, and Garrete was in the passenger seat.

28.     Davila had driven approximately 250 feet on Perry Highway after exiting the parking lot of Los Campos when Andrew Bienemann, an officer employed by the Northern Regional Joint Police Board, pulled up behind her in his police car with his siren on, indicating that he wanted her to stop her car.

29.     Davila turned left into the parking lot of Patron's Mexican Grill, located at 11675 Perry Highway.

30.     Bienemann followed Davila into the parking lot and executed a vehicle stop of Davila and her passenger Garrete.

31.     Bienemann informed Davila that he had stopped her because her headlights were off and asked Davila for her license, proof of registration, and insurance.

32.     Davila provided all of the requested documents to Bienemann.

33.     Bienemann had no reason to question the authenticity of any of the documents Davila provided to him.

34.     Bienemann also asked for Garrete's identification.

35.     Garrete did not speak English. He is a native of Honduras who spoke only Spanish. He is and appears to be Hispanic.

36.     Because Garrete did not speak English, Bienemann asked Davila to translate for him.

37.     Davila complied with Bienemann's request to translate.

38.     Garrete provided his name and date of birth.

39.     Bienemann then asked Garrete if he had any identification with him, such as a visa or passport.

40.     Garrete provided Bienemann with his pay stub, which showed his address.

41.     Bienemann asked whether Garrete was legally present in the United States.

42.     Davila translated Bienemann's question, and Garrete answered "no."

43.     Until this time, Davila had not known that Garrete was not lawfully present in the United States.

44.     Bienemann then contacted the police dispatcher to ask that Garrete's name be submitted to the Law Enforcement Support Center ("LESC"), a national law enforcement operations facility administered by ICE, to determine Garrete's immigration status.

45.     Although he had no reason to suspect that Davila was not legally present in the United States, Bienemann also asked the dispatcher to submit Davila's name to the LESC.

46.     As a result of Officer Bienemann's request, ICE Law Enforcement Specialist Hayhurst conducted an immigration alien query ("IAQ") on both Davila and Garrete.

47.     Hayhurst told the police dispatcher that there was no match found for Garrete and that Davila was out of status.

48.     The police dispatcher relayed that information to Bienemann.

49.     Officer Bienemann then asked the dispatcher to put him in contact with an ICE agent.

50.     ICE Special Agent Jason Kenwood was contacted by the police dispatcher regarding the stop of Davila and Garrete. At 7:04 p.m., Kenwood contacted ICE Special Agent Brianna Tetrault via telephone.

51.     Upon information and belief, Kenwood told Tetrault the results of the IAQ conducted by Hayhurst.

52.     Tetrault was eventually connected to Bienemann, who was still roadside with Davila and Garrete, and communicated with him via his cell phone.

53.     Bienemann told Tetrault Davila's name and date of birth and informed Tetrault that Davila had a Pennsylvania driver's license that listed her city of residence as West Mifflin, a suburb of Pittsburgh.

54.     Tetrault asked to speak with Davila.

55.     Bienemann approached Davila's car with a cell phone and told Davila that an immigration officer was on the phone.

56.     At Tetrault's request, Davila provided her name, date of birth, address, and cell phone number.

57.     Tetrault asked Davila if she had a visa, and Davila told Tetrault that she was a lawful permanent resident ("LPR").

58.     Although Davila was a United States citizen at the time, she was hesitant to claim citizenship because her certificate of citizenship was still pending and she did not possess any other proof of her United States citizenship.

59.     Davila did have a card proving her status as a lawful permanent resident but did not have the card on her person at the time of the stop.

60.     Davila had gone to the gym before going out to dinner and only carried her driver's license, ATM card, and gym membership card on her person. She kept her proof of insurance and vehicle registration in her car.

61.     Davila did not have her LPR card with her that evening because she was afraid of losing it.

62.     The cost to replace a lost or stolen LPR card is $450.

63.     Tetrault asked Davila if she had her LPR card with her.

64.     Davila told Tetrault that she had lived in the United States for many years but did not have her LPR card on her person.

65.     Tetrault never asked Davila whether someone could retrieve Davila's LPR card for her and bring it to the scene nor did she provide Davila with any other opportunity to retrieve her LPR card.

66.     As a United States citizen, Davila was not required to carry her LPR card with her.

67.     Tetrault did not ask Davila whether she had applied for a certificate of U.S. citizenship or United States passport, whether she was eligible to claim citizenship, or whether Davila's parents were United States citizens.

68.     Tetrault did not ask Davila whether she had an alien registration number or social security number.

69.     From the information Davila provided to Tetrault, there was no reasonable basis to believe that Davila was not legally present in the United States.

70.     The only basis that Tetrault had for suspecting that Davila was not lawfully present was the immigration alien report ("IAR"), which indicated that Davila was out of status.

71.     According to the IAR, the only biographical information used by the LESC to conduct the IAQ on Davila was her first and last name (Angelica Davila), her date of birth, her place of birth (Mexico), and her sex (female).

72.     The IAR for Davila included a disclaimer stating: "This is not a law enforcement detainer! This information is for law enforcement use and is being provided for informational purposes only. This response is not supported by fingerprints."

73.     David C. Palmatier, the then-Unit Chief for the LESC, stated in a June 2010 declaration filed in the United States District Court for the District of Arizona that "LESC's responses to IAQs do not always provide a definitive answer as to an alien's immigration status."

74.     Upon information and belief, the databases searched when the LESC conducts an IAQ based on biographical data are not sufficiently accurate to provide a reasonable basis, without more, to believe that an individual is an alien who is unlawfully present in the United States.

75.     Upon information and belief, Agent Tetrault did not personally search any databases or files, contact Hayhurst, or take any other steps to determine whether the initial IAR was accurate, despite Davila's claim that she was a lawful permanent resident, her knowledge

8

that Davila had a Pennsylvania driver's license, and the known deficiencies in the LESC's responses to IAQs.

76.     During her conversation with Davila, Tetrault never gave Davila any reason to believe that her immigration status was under investigation.

77.     Tetrault never asked Davila any questions regarding her community ties, such as how long she had resided in Pittsburgh, where she worked, or whether she had any friends or family in the Pittsburgh area.

78.     Tetrault told Davila that the reason she was asking Davila questions about her immigration status was because she wanted to use Davila as an interpreter to speak with Garrete.

79.     Davila agreed to interpret for Garrete.

80.     After she finished using Davila as an interpreter, Tetrault asked Bienemann to take Davila into custody and transport her to the Allegheny County Jail.

81.     Tetrault also asked Bienemann to transport Garrete to the Jail.

82.     Tetrault advised Bienemann that she would complete immigration detainers for Davila and Garrete and fax them to the police station.

83.     Bienemann agreed to transport Davila and Garrete to the Allegheny County Jail.

84.     There was no warrant for Davila's arrest.

85.     Approximately two hours after the initial vehicle stop, Davila and Garrete were handcuffed, placed in Bienemann's vehicle, and transported to the Northern Regional Police Department station in Pine Township, Pennsylvania.

86.     At the police station, Davila asked why she was being held. She was told that immigration had told the officers to take her in.

87.     Davila and Garrete were held at the Northern Regional Police Department station

for fifteen to twenty minutes.

88.     Tetrault signed detainers for Davila and Garrete and faxed them to Bienemann.

89.     The immigration detainer issued by Tetrault for Davila misspelled her last name as Devila-Garcoa.

90.     The immigration detainer falsely described Davila as an "alien" and falsely listed her nationality as "Mexican."

91.     The immigration detainer correctly listed Davila's date of birth.

92.     The immigration detainer misspelled the word order as "Oder" in its title, "Order to Detain or Release Alien."

93.     The face of the immigration detainer identifies it as "Form I-203 (Rev. 01/31/05) N."

94.     Form I-203 is used to hold an immigration detainee in federal custody.

## Davila's Imprisonment and Release

95.     Bienemann transported Davila and Garette to the Allegheny County Jail at about 8:30 p.m.

96.     The Allegheny County Jail has an intergovernmental services agreement with ICE whereby ICE pays the Jail to hold detainees on ICE's behalf.

97.     At 8:30 p.m., Kenwood received a call from Hayhurst advising that Hayhurst had made an error on the IAQ.

98.     Hayhurst told Kenwood that there were three alien registration numbers associated with Davila, with the most recent showing that Davila was a lawful permanent resident.

99.     At 8:48 p.m., Kenwood called the police dispatcher regarding the information he

learned from Hayhurst and was told that Bienemann had taken Davila to the Jail.

100.    At 8:55 p.m., Kenwood spoke with Senior Law Enforcement Specialist Shawn Phelps, advising Phelps that Davila may be a lawful permanent resident who had been detained on incorrect information.

101.    Based on Phelps' instruction, Kenwood located a photograph of Davila and emailed it to Bienemann to ask him to confirm whether the photograph depicted the woman he had taken into custody.

102.    At 9:19 p.m., Bienemann confirmed that the photograph was of Davila. Bienemann also told Kenwood that Davila claimed to be legally present.

103.    Kenwood advised Tetrault at 9:28 p.m. that there was a discrepancy between the IAR and the alien registration numbers and that there was a possibility that Davila was lawfully present.

104.    Upon information and belief, despite this information, no ICE officer took any immediate steps to have Davila released from the Allegheny County Jail.

105.    Davila remained in jail for ten hours after Agent Tetrault learned of the information showing she was lawfully present.

106.    Davila was released from the Allegheny County Jail at 7:30 a.m. the next morning based on the new information reported to Kenwood by Hayhurst at 8:30 the previous night.

107.    At 8:15 a.m., Davila was picked up from the jail by a friend and taken home.

108.    Garrete was transferred to the ICE Detention Facility in York, Pennsylvania, and deported to Honduras.

109.    Davila did not receive a citation or any other charge for driving without headlights.

110.    Davila was never charged with any criminal offense.

111.    As a direct and proximate result of the conduct of officers employed by ICE, Davila suffered substantial damages, including emotional distress and harm, embarrassment, and lost liberty.

112.    The ICE officers' actions deprived Davila of her liberty and thus amounted to a seizure of her person.

113.    The ICE officers' actions deprived Davila of her liberty with reckless indifference to the absence of a basis on which to detain her or to continue to detain her.

## CAUSES OF ACTION

### Count I

### Federal Tort Claims Act – False Arrest and False Imprisonment

114.    The actions of investigative or law enforcement personnel working on behalf of the United States as described above, including Agent Tetrault's involvement in plaintiff's arrest and detention pursuant to the order that she issued, intentionally caused plaintiff to be arrested, detained, and confined, without probable cause or any other legal justification, and as a result, plaintiff was arrested, detained, and confined unlawfully.

115.    The failure of investigative or law enforcement personnel working on behalf of the United States as described above to promptly secure plaintiff's release from the Allegheny County Jail upon receipt of information that she was a lawful resident who was not subject to detention or deportation was unlawful and resulted in plaintiff's confinement for ten additional hours.

116.    The actions of the ICE officers constitute the torts of false arrest and false imprisonment under the laws of the Commonwealth of Pennsylvania.

117.    Under the Federal Tort Claims Act, defendant United States of America is liable for these actions.

## Count II

## Federal Tort Claims Act – Negligence

118.    The ICE officers owed a duty to plaintiff and, as described above, breached their duty to plaintiff, and, as such, were a direct and proximate cause of and a substantial factor in bringing about plaintiff's damages outlined above.

119.    The actions of the ICE officers constitute the tort of negligence under the laws of the Commonwealth of Pennsylvania.

120.    Under the Federal Tort Claims Act, defendant United States of America is liable for these actions.

## PRAYER FOR RELIEF

Wherefore, in light of the foregoing, plaintiff respectfully requests the following:

(a) compensatory damages;

(b) reasonable attorney's fees and costs;

(c) any such other and further relief as may appear just and appropriate.

Thursday, January 16, 2014

Respectfully submitted,

*/s/ Sara J. Rose*
Sara J. Rose
PA ID No.: 204936

*/s/ Witold J. Walczak*
Witold J. Walczak
PA ID No.: 62976

ACLU FOUNDATION OF PENNSYLVANIA
313 Atwood Street
Pittsburgh, PA 15213
(412) 681-7864
srose@aclupa.org
vwalczak@aclupa.org

*s/ Thomas J. Farrell*
Thomas J. Farrell
PA ID No. 48796

*s/ Emily C. McNally*
Emily C. McNally
PA ID No. 206591

FARRELL & REISINGER
200 Koppers Building
436 Seventh Avenue
Pittsburgh, PA 15219
412-894-1380
TFarrell@farrellreisinger.com
EMcNally@farrellreisinger.com