# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ANGELICA DAVILA, | ) |
| | ) |
| Plaintiff, | ) Civil Action No. 2:14-070 |
| | ) (consolidated with 2:13-cv-00070) |
| v. | ) |
| | ) Judge Mark R. Hornak |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Defendant. | ) |

## **OPINION**

**Mark R. Hornak, United States District Judge**

Before the Court is Plaintiff Angelica Davila's Motion for Reconsideration in No. 14-cv-70, ECF No. 16.[1] Ms. Davila filed this suit against the United States under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346, 2671, *et seq.*, following a traffic stop, which she asserts was predicated upon her Hispanic heritage and which led to her warrantless arrest. Davila raised claims of false arrest and false imprisonment[2] based on the role of a Federal Immigration and Customs Enforcement (ICE) officer, Special Agent Brianna Tetrault, in that arrest.[3]

---

[1] Unless otherwise noted, all ECF references in this Opinion refer to the docket of No. 14-cv-70.

[2] Davila also raised a negligence claim but has since withdrawn it. *See* No. 13-cv-70, ECF No. 129 at 5 n.8.

[3] Prior to filing this suit against the United States, Davila brought another suit arising out of the same incident. It named as defendants Agent Tetrault, the Northern Regional Joint Police Board, two local police officers named Sergeant John Sicilia and Patrolman Andrew Bienemann, and Allegheny County (PA). That suit is on this Court's docket at No. 13-cv-70. The Court consolidated that suit with this action on February 10, 2014. *See* ECF No. 11; No. 13-cv-70, ECF No. 101. On October 21, 2013, the Court granted Sergeant Sicilia's Motion to Dismiss, Allegheny County's Motion to Dismiss, and Agent Tetrault's Motion to Dismiss. No. 13-cv-70, ECF No. 84 at 2, 32. The Court denied Officer Bienemann's Motion to Dismiss and the Northern Regional Joint Police Board's Motion to Dismiss. *Id.* Then the Court granted in part and denied in part Officer Bienemann's renewed Motion to Dismiss. No. 13-cv-70, ECF No. 182 at 11. Both Officer Bienemann and the Northern Regional Joint Police Board remain Defendants in No. 13-cv-70.

The Court previously granted the United States' Motion to Dismiss[4] Davila's false arrest and false imprisonment claims under the FTCA, concluding that Agent Tetrault had probable cause to request that local law enforcement detain Davila without a warrant under the authority of 8 U.S.C. § 1304(e) and Davila's actions therefore could not give rise to liability on the part of the United States. ECF No. 14 at 9-12. Davila subsequently filed the instant Motion for Reconsideration, arguing that the Court's dismissal of her claims against the United States was in error.

For the reasons set forth below, the Court will grant Davila's Motion for Reconsideration of the Court's dismissal of her claims against the United States, ECF No. 16. Upon such reconsideration, the Court concludes that questions of fact preclude the dismissal of Davila's false arrest and false imprisonment claims against the United States. The Court's dismissal Order, ECF No. 15, will therefore be vacated to the extent it granted the United States' Motion to Dismiss Davila's false arrest and false imprisonment claims. The United States will remain a defendant in No. 14-cv-70 as to those claims.

## I.    BACKGROUND

The Court has set forth previously the extensively pled facts of this case, including those relevant as to claims against other Defendants in No. 13-cv-70. The Court repeats here those facts relevant to the determination of the instant Motion, accepting as true those factual allegations in the Complaint and drawing all reasonable inferences therefrom in Davila's favor. *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011).

The parties agree that Davila is a United States citizen who was born in Mexico. Davila legally immigrated to the United States with her parents when she was two years old, and she

---

[4] The United States' Motion to Dismiss is docketed at No. 13-cv-70, ECF No. 115.

became a lawful permanent resident of the United States when she was sixteen. She moved to the Pittsburgh (PA) area in 2007. Davila previously sought derivative citizenship status under the Child Citizenship Act of 2000, 8 U.S.C. § 1431, *et seq.*, under which a child automatically becomes a citizen on the date she satisfies certain requirements.[5] Davila became a citizen by operation of law in 2001, and the United States does not dispute that fact.[6]

On January 22, 2011, Davila drove to a grocery store in Allegheny County, Pennsylvania. Joel Garrete was her passenger. Around 5:45 p.m., Davila drove out of the grocery store parking lot onto Perry Highway. She drove approximately 250 feet on the highway before Officer Andrew Bienemann, a local patrolman, pulled her over. Bienemann informed Davila that he stopped her because her headlights were off.

Officer Bienermann asked Davila for her driver's license, proof of vehicle registration, and proof of vehicle insurance. Davila provided all three.[7] Bienemann then questioned Mr. Garrete. Since Garrete did not speak English, Bienemann asked Davila to act as a translator, and she obliged. Bienemann asked for Garrete's identification. In response, Garrete provided Bienemann with a pay stub showing his address. Bienemann asked Garrete whether Garrete was legally present in the United States, and Garrete responded that he was not.

---

[5] A child born outside of the United States automatically becomes a citizen of the United States when all of the following conditions have been fulfilled: (1) at least one parent of the child is a citizen of the United States, whether by birth or naturalization; (2) the child is under the age of 18 years; and (3) the child is residing in the United States in the legal and physical custody of the citizen parent pursuant to a lawful admission for permanent residence. *See* Child Citizenship Act of 2000, Pub. L. 106-395, 114 Stat. 1631 (codified at 8 U.S.C. § 1431).

[6] Apparently unbeknownst to all involved, including Davila herself, Davila was a citizen of the United States during the entirety of the events giving rise to this lawsuit due to the automatic citizenship provisions of the Child Citizenship Act of 2000. Her father is a United States citizen, her mother is a naturalized citizen, Davila moved to the United States when she was two years old, and she became a lawful permanent resident at the age of 16 while still in the custody of her parents. The United States does not dispute that Davila was a citizen when she was detained and had been a citizen for about a decade. *See* ECF No. 1 at 3; *see also* No. 13-cv-70, ECF No 148 at 1-3; No. 13-cv-70, ECF No. 116 at 8.

[7] The United States has not argued that Davila's identification was invalid or suffered from any defect.

3

Officer Bienemann returned to his patrol car, contacted the police dispatcher, and asked the dispatcher to check the immigration status of both Davila and Garrete with ICE. As a result of Bienemann's request, ICE Law Enforcement Specialist Hayhurst conducted an immigration alien query (IAQ) on both Davila and Garrete. For Davila, this initial IAQ was based on her name, date of birth, place of birth (Mexico), and sex. ECF No. 1 at 8. Certain ICE records[8] from the initial IAQ show that Davila was listed as "out of status." There was "no match found" for Garrete. ECF No. 1 at 6; *see also* No. 13-cv-70, ECF No. 112-5 at 7.

While Davila was stopped on the side of the road, Special Agent Brianna Tetrault, an ICE officer, contacted Officer Bienemann on his cell phone. Bienemann relayed Davila's name and date of birth to Tetrault. Bienemann also informed Tetrault that Davila had a Pennsylvania driver's license that listed her residence as West Mifflin, a suburb of Pittsburgh (PA). Tetrault then asked to speak to Davila, and Bienemann handed Davila his phone.

Agent Tetrault told Davila that the reason she was asking questions about Davila's immigration status was because Tetrault, like Bienemann, wanted to use Davila as an interpreter to speak with Garrete. Davila agreed to this arrangement. In response to Tetrault's questions, Davila provided Tetrault with her name, date of birth, address, and cell phone number. Davila also told Tetrault her country of origin. ECF No. 1 at 6; No. 13-cv-70, ECF No. 138 at 7. Tetrault asked Davila if she had a visa. Davila told Tetrault—mistakenly—that she was a lawful permanent resident of the United States rather than a citizen.[9] Davila said that she had lived in the United States for many years. Tetrault asked Davila whether Davila had her lawful

---

[8] The Court previously explained its grounds for considering such records at the motion to dismiss stage in No. 13-cv-70. *See* No. 13-cv-70, ECF No. 84 at 27-28; *see also Davila I*, 979 F. Supp. 2d at 636-37. Davila subsequently incorporated the information referenced here into her Complaint against the United States in No. 14-cv-70. *See* ECF No. 1 at 6.

[9] Davila says she was hesitant to claim citizenship because she believed her certificate of citizenship was still pending and because she was not in possession of documents that would prove her citizenship. ECF No. 1 at 7.

4

permanent resident card with her, and Davila responded that she did not.[10] ECF No. 1 at 7. When Tetrault was done questioning Davila, Davila interpreted for Tetrault while Tetrault questioned Garrete.

At some point during all of this, the results of Specialist Hayhurst's IAQ—that Davila was "out of status" and that there was "no match found" for Garrete—were relayed to both Officer Bienemann and to Agent Tetrault. ECF No. 1 at 6. The police dispatcher relayed the results to Bienemann, and Special Agent Jason Kenwood, another ICE agent, relayed them to Tetrault. *Id.*

Agent Tetrault then requested that Officer Bienemann detain both Davila and Garrete and take them to the Allegheny County Jail for holding. This occurred approximately two (2) hours after Bienemann pulled Davila's car over. Tetrault advised Bienemann that she would execute immigration detainers for Davila and Garrete and fax them to Bienemann's local police station. Davila and Garrete were handcuffed, placed in Bienemann's vehicle, and taken to the local police station. ECF No. 1 at 9. Tetrault signed federal immigration detainers for Davila and Garrete and faxed them to Bienemann. Davila's detainer misspelled her last name as Devila-Garcoa. The detainer also described Davila as an "alien" and listed her nationality as "Mexican." ECF No. 1 at 10. Within about an hour of her arrival at the local police station, Davila was taken to the Allegheny County Jail.

ICE records located after Davila's imprisonment show that Davila had multiple Alien Registration Numbers, or "A-numbers"—numbers issued by the Department of Homeland Security to an individual when she becomes a lawful permanent resident of the United States or attains other lawful, non-citizen status. In all, the search turned up three A-numbers: one listing

---

[10] The United States concedes that as a citizen, Davila was not under any legal requirement to carry her lawful permanent resident card. *See* No. 13-cv-70, ECF No. 148 at 2-3.

Davila as "family fairness granted," a status which provides for relief from removal and authorizes a legal permanent resident's spouse or unmarried child to be employed; a second listing Davila as "family fairness denied"; and a third listing Davila as status IR-7, a classification used for legal permanent residents who are children of a U.S. citizen. *See* No. 13-cv-70, ECF No. 112-5 at 7.

These later-discovered records led to Davila's release. *Id.* After completing a review of the immigration detainer, Agent Kenwood told Officer Bienemann that a mistake had been made regarding Davila's identity. Kenwood informed Bienemann that Davila may have been incorrectly detained and that she should be released. This was at or around 9:50 p.m.—about four hours after the stop, about two hours after Agent Tetrault issued the immigration detainer, and about one hour after Davila's arrival at local the police station. In addition to Kenwood telling Bienemann that Davila should be released at or around 9:50 p.m., ICE sent a fax at 11:05 p.m.to the Allegheny County Jail ordering Davila's release. ICE provided the Allegheny County Jail with a copy of Davila's lawful permanent resident card and other proof of her legal residence.

Despite all this, Davila was not released from the Allegheny County Jail until 7:30 a.m. the following morning. In all, Davila was detained for about fourteen hours: two full hours at the side of the road, approximately another hour during travel to and at the local police station, and then overnight in the Allegheny County Jail.

## II. **LEGAL STANDARD**

A court should grant reconsideration of a prior order if the moving party demonstrates (1) an intervening change in the controlling law, (2) the existence of new evidence that was unavailable when the court issued its order, or (3) the need to correct a clear error of law or fact

6

or to prevent a manifest injustice. *Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999).

## III.   ANALYSIS

### A.

Davila asks the Court to reconsider its Order dismissing the United States from the case based upon the Court's conclusion that Agent Tetrault had probable cause to request that local law enforcement detain Davila without a warrant under the authority of 8 U.S.C. § 1304(e) and Davila's actions therefore could not give rise to liability on the part of the United States for false arrest or false imprisonment. ECF No. 14 at 9-12.

> 8 U.S.C. § 1304(e) provides that:

>> Every alien, eighteen years of age and over, shall at all times carry with him and have in his personal possession any certificate of alien registration or alien registration receipt card issued to him pursuant to subsection (d) of this section. Any alien who fails to comply with the provisions of this subsection shall be guilty of a misdemeanor and shall upon conviction for each offense be fined not to exceed $100 or be imprisoned not more than thirty days, or both.

8 U.S.C. § 1304.

Both Davila and the United States tell the Court that its conclusion that Agent Tetrault had probable cause to request Davila's detention without a warrant under the authority of 8 U.S.C. § 1304(e) was in error. ECF No. 17 at 2-3; ECF No. 20 at 1-3; ECF No. 21 at 1. This, according to Davila, was because the Court failed to consider the limitations on Tetrault's authority to conduct a warrantless arrest, certain of which are set forth in another provision of federal law: 8 U.S.C. § 1357(a)(2). *See* ECF No. 16 at 1-2; ECF No. 21 at 1. The United States agrees that the limitations of 8 U.S.C. §1357(a)(2) constrain Tetrault's authority in this case. ECF No. 20 at 1-3. But, the United States says, the Court's error was "harmless" because

§ 1357(a)(2)—rather than § 1304(e)—provided Tetrault with probable cause to request Davila's detention. ECF No. 20 at 1-3.

Because the parties agree that 8 U.S.C. § 1357(a)(2) limits Agent Tetrault's authority, the Court concludes that an evaluation of the extent of Tetrault's authority under that provision is necessary to render a determination of whether Davila sufficiently stated a claim for false arrest and false imprisonment such that the United States can be liable under the FTCA. The Court will therefore assume for the purposes of resolving the instant Motion to Reconsider, without deciding, that its conclusion that Tetrault had probable cause to request Davila's detention under 8 U.S.C. § 1304(e) was in error.[11] Davila's Motion for Reconsideration, ECF No. 16, will therefore be granted, and the Court will reconsider its July 28, 2014 Opinion and Order dismissing the false arrest and false imprisonment claims against the United States, ECF Nos. 14-15, in order to address the limitations 8 U.S.C. § 1357(a)(2) places on Tetrault's authority.[12]

**B.**

The Court now considers for a second time whether the United States' Motion to Dismiss Davila's false arrest and false imprisonment claims under the FTCA should be granted. Under the plausibility standard governing motions to dismiss pursuant to Federal Rule of Civil

---

[11] The Court harbors substantial doubts about the correctness of the parties' apparent contention that Davila's status as a citizen rather than as a lawful permanent resident—a fact which was apparently unknown even to Davila, ECF No. 17 at 2—precludes as a legal matter the possibility that Agent Tetrault may have had probable cause to request Davila's detention for a violation of 8 U.S.C. § 1304(e) based upon the belief, albeit incorrect, that Davila was not in possession of proper documentation. Davila herself claimed to be a lawful permanent resident not in possession of her lawful permanent resident card.

[12] The Court previously concluded that the United States cannot be liable for the conduct of Officer Bienemann prior to Agent Tetrault's request that he detain Davila. Bienemann's initial stop of Davila was not under the auspices of or in any way subject to supervision by the United States such that he would be considered an agent of the federal government at that time. *See, e.g.*, *Lomando v. United States*, 667 F.3d 363, 373-74 (3d Cir. 2011) (explaining that the United States is answerable under the FTCA in the same manner and to the same extent as a private employer under like circumstances). Nor is there a basis for liability of the United States after ICE transmitted a fax to the Allegheny County Jail ordering (or requesting) that Davila be released from custody. The parties do not argue that the Court should revisit those portions of its ruling. The Court will therefore confine its review of the facts to those that occurred during the period from Tetrault's request to Bienemann that Bienemann detain Davila until ICE informed the Allegheny County Jail that Davila should be released.

8

Procedure 12(b)(6), courts must "accept all factual allegations [in the complaint] as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff . . . has a 'plausible claim for relief.'" *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d. Cir. 2009).

The FTCA waives the United States' sovereign immunity for torts committed by its employees acting within the scope of their employment. 28 U.S.C. § 1346(b)(1). Under the FTCA, the United States must answer for the acts of its employees "in the same manner and to the same extent as a private individual under like circumstances." *Lomando*, 667 F.3d at 373 (citing 28 U.S.C. § 2674; *United States v. Olson*, 546 U.S. 43, 46 (2005)). The scope of FTCA liability is determined by reference to state law. *Id.* at 372-73. Although the FTCA contains an exception to its waiver of sovereign immunity for false arrest and false imprisonment claims, that exception does not apply where such claims arise out of the acts or omissions of investigative or law enforcement officers of the United States. 28 U.S.C. § 2680(h).

The events giving rise to Davila's claims occurred in Pennsylvania. Under Pennsylvania law, false arrest and false imprisonment are nearly identical actions. *Watson v. Witmer*, 183 F. Supp. 3d 607, 617 (M.D. Pa. 2016). Courts applying Pennsylvania law generally analyze such claims together when they are factually intertwined. *See Brockington v. City of Philadelphia*, 354 F. Supp. 2d 563, 571, n.8 (E.D. Pa. 2005). The elements of the claims are essentially the same: (1) the defendant intended to confine the plaintiff; (2) the defendant performed an action that directly or indirectly produced such confinement; and (3) the plaintiff was either conscious of or harmed by the conduct. *Witmer*, 183 F. Supp. 3d at 617. In the context of a seizure by a state officer, the plaintiff must additionally show that such detainment was unlawful. *Id.* (citing *Renk v. City of Pittsburgh,* 641 A.2d 289, 293 (Pa. 1994)). "[C]ases involving false arrest claims

against police officers turn on the existence or nonexistence of probable cause." *Kokinda v. Breiner*, 557 F. Supp. 2d 581, 593 (M.D. Pa. 2008). An arrest based on probable cause is legally justified, and it therefore cannot give rise to liability for false arrest or false imprisonment. *See Renk*, 641 A.2d at 293.

**1.**

As an initial matter, the Court must determine whether Davila's factual allegations—that Agent Tetrault asked Officer Bienemann to detain her and subsequently issued an immigration detainer—are legally sufficient to amount to an intentional confinement and/or arrest attributable to Tetrault for false imprisonment and false arrest purposes such that Davila can state a claim against the United States on those theories under Pennsylvania law.

The issuance of an immigration detainer, without more, does not subject an individual to INS custody. *See Garcia v. INS*, 733 F. Supp. 1554, 1555 (M.D. Pa. 1990).[13] Here, however, Davila has pled more. She was handcuffed and jailed solely based upon Agent Tetrault's request to Officer Bienemann and Tetrault's subsequent issuance of an immigration detainer. The Court therefore concludes that Bienemann's detention of Davila, as pled, is attributable to Tetrault; Davila was detained indirectly by Tetrault despite the fact that Bienemann physically took her into custody.

The specific set of facts that Davila alleges warrants this conclusion. Agent Tetrault requested that Officer Bienemann detain Davila and take her to the Allegheny County Jail.

---

[13] *See also Galaviz–Medina v. Wooten*, 27 F.3d 487, 493 (10th Cir.1994) ("Because there is no actual claim to the alien following the completion of his criminal sentence, there is no custody."); *Prieto v. Gluch*, 913 F.2d 1159, 1162-64 (6th Cir.1990) (petitioner not "in custody" where INS "detainer notice does not claim the right to take a petitioner into custody in the future nor does it ask the warden to hold a petitioner for that purpose"); *Campillo v. Sullivan*, 853 F.2d 593, 595 (8th Cir.1988) (where detainer "merely notifies prison officials that a decision regarding his deportation will be made by the INS at some future date ... filing of an INS detainer, standing alone, does not cause a sentenced offender to come within the custody of the INS"). *But see Vargas v. Swan*, 854 F.2d 1028, 1032–33 (7th Cir.1988) (noting that a detainer could, under particular circumstances, be sufficient to satisfy the custody requirement).

10

Davila was pulled over by Bienemann because her headlights were turned off; but for Tetrault's instruction to Bienemann, there was no reason for Davila's detention. According to Davila, the Allegheny County Jail maintained an intergovernmental services agreement with ICE whereby ICE would pay the Jail to hold detainees on ICE's behalf. Tetrault advised Bienemann that she would execute an immigration detainer for Davila and fax it to Bienemann's local police station. Bienemann then took Davila into physical custody solely based upon the authority of Tetrault's request. Davila was handcuffed and placed in Bienemann's vehicle. ECF No. 1 at 9. Tetrault's actions thus resulted in Davila's formal arrest, her transport to the local police station, and ultimately, her imprisonment in the Allegheny County Jail. Davila was not taken into custody on any state charge. She was never charged with a state crime or even a traffic infraction.

Given these facts, Pennsylvania's intentional tort law supports the imputation of Davila's detention to Agent Tetrault. Under Pennsylvania's false imprisonment doctrine, a detention need not have been directly caused in order to support liability for the tort of false imprisonment. It is well established that an actor is liable for false imprisonment where his acts directly *or indirectly* result in the confinement of another. *See, e.g.*, *Gagliardi v. Lynn*, 446 Pa. 144, 148, n.2 (1971) (confinement for false imprisonment purposes may be direct or indirect). Under Pennsylvania's false arrest doctrine, a plaintiff may in some circumstances state a claim against a third party who wrongfully instigates his arrest.[14] *See, e.g.*, *Gilbert v. Feld*, 788 F. Supp. 854, 862 (E.D. Pa.

---

[14] *See also Clark v. Conahan*, 737 F. Supp. 2d 239, 272 (M.D. Pa. 2010) (requiring purposeful deception); *Demby v. Drexel Univ.*, No. 2511-2014, 2016 WL 5515853, at *6 (Pa. Super. Ct. Aug. 16, 2016); *Land v. Delta Air Lines, Inc.*, No. 15-cv-5240, 2015 WL 8269435, at *2 (E.D. Pa. Dec. 7, 2015); *Fowler v. CVS Health CVS/Pharmacy*, No. 15-cv-1595, 2015 WL 3885145, at *6 (E.D. Pa. June 23, 2015); *Perry v. Redner's Mkt., Inc.*, No. 09-cv-5645, 2010 WL 2572651, at *4 (E.D. Pa. June 21, 2010); *Benn v. Universal Health Sys., Inc.*, No. 99-cv-6526, 2001 WL 1251207, at *11 (E.D. Pa. July 24, 2001); *Doby v. Decrescenzo*, No. 94-cv-3991, 1996 WL 510095, at *13 (E.D. Pa. Sept. 9, 1996). *But see Reiber v. Fillipone*, No. 15-cv-6192, 2016 WL 7034704, at *3 (E.D. Pa. Dec. 2, 2016) (refusing to recognize false arrest or false imprisonment claims as against third parties); *Thomas v. IPC Int'l Corp.*, No. 02-cv-8049, 2004 WL 292477, at *4 (E.D. Pa. Feb. 12, 2004); *Simmons v. Poltrone*, No. 96-cv-8559, 1997 WL 805093, at *8 (E.D. Pa. Dec. 17, 1997).

1992) (a plaintiff states claims for false arrest and false imprisonment where he alleges a defendant instigated an arrest or imprisonment through his influence on a third party) (citing *Hess v. Lancaster County*, 514 A.2d 681, 683 (Pa. Commw. Ct. 1986) (in the context of malicious prosecution, "one who procures a third person to institute criminal proceedings against another is liable just as if he himself had initiated the proceedings.")). In addition, a private employer[15] may be vicariously liable under Pennsylvania law for its employees' false imprisonment of another to the extent the employee was acting within the scope of his employment.[16] *Sebastianelli v. Cleland Simpson Co.*, 152 Pa. Super. 203, 204, 207-08 (1943). Agent Tetrault appears to have been acting within the scope of her employment during the course of the events giving rise to this lawsuit, and the United States has not claimed otherwise.

The Court also notes that the entire point of an immigration detainer is to effect a detention. "A detainer is a tool used by ICE to hold individuals who are taken into state custody." *Morales v. Chadbourne*, --- F. Supp. 3d ---, No. 12-cv-301, 2017 WL 354292, at *1, n.1 (D.R.I. Jan. 24, 2017). It "serves to advise another law enforcement agency that the Department seeks custody of an alien presently in the custody of that agency[] for the purpose of arresting and removing the alien." 8 C.F.R. § 287.7(a). It "is a written request that the state law enforcement officers detain an individual for no more than 48 hours after his or her release on state charges so that ICE can investigate that person's immigration status." *Morales*, 2017 WL 354292, at *1, n.1; *see also* 8 C.F.R. § 287.7(d). Its very purpose is to allow immigration officials "to assume custody[] in situations when gaining immediate physical custody is either impracticable or impossible." 8 C.F.R. § 287.7(a).

---

[15] The United States is analogous to a private employer in an FTCA action. *See, e.g.*, *Lomando*, 667 F.3d at 373.

[16] This flows from the general principle that an employer may be liable for the intentional torts of his employee committed within the scope of employment. *See, e.g.*, *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265, 1276 (3d Cir. 1979).

Indeed, as a legal matter, Officer Bienemann would not have had the authority to detain Davila solely based upon her immigration status—as the United States now says was proper for him to do—but for Agent Tetrault's request. Local law enforcement officials cannot unilaterally detain individuals based on mere suspicion of illegal presence in the United States. *See Arizona v. United States*, 132 S. Ct. 2492, 2505 (2012). "As a general rule, it is not a crime for a removable alien to remain present in the United States." *Id.* Thus, "[i]f the police stop someone based on nothing more than possible removability, the usual predicate for an arrest is absent." *Id.* Instead, local law enforcement officers conducting an immigration arrest are required by federal law to do so in cooperation with the appropriate federal officials except in certain limited circumstances not applicable here. *Id.* at 2506; *see also* 8 U.S.C. §§ 1103(a)(10); 1252c; 1324(c). Apart from such limited circumstances, it is only when acting at the behest of federal officials that local law enforcement officers have the authority to enforce federal immigration law.[17]

Neither the text of the FTCA nor federal decisional law interpreting it appear to foreclose the possibility of attributing Davila's detention by Officer Bienemann to Agent Tetrault if state

---

[17] The provision of federal law that the United States says authorized Agent Tetrault to request Davila's detention, 8 U.S.C. § 1357, explicitly contemplates cooperation from state officers and employees in the performance of immigration functions at the direction of federal officials. *See* § 1357(g). The Attorney General may, at his discretion, enter into a written agreement with state or local law enforcement for such purposes. *Id.* But an agreement is not required for federal immigration enforcement to request cooperation in the identification, apprehension, detention, or removal of aliens unlawfully present in the United States or for such cooperation to occur under such provision. *Id.* § 1357(g)(10); *see also Buquer v. City of Indianapolis*, No. 11-cv-00708, 2013 WL 1332158, at *2 (S.D. Ind. Mar. 28, 2013). The Supreme Court has explained that "there may be some ambiguity as to what constitutes cooperation under the federal law." *Arizona*, 132 S. Ct. at 2507. The Court went on to note some examples of what might constitute such cooperation. "These include situations where States participate in a joint task force with federal officers, provide operational support in executing a warrant, or allow federal immigration officials to gain access to detainees held in state facilities." *Id.* A state official conducting an arrest at the sole behest of a federal immigration officer—as Officer Bienemann did at Tetrault's direction in this case—appears to the Court to fall within the ambit of such joint cooperation efforts. And federal law specifically provides that any "officer or employee of a State or political subdivision of a State acting under color of authority under this subsection, or any agreement entered into under this subsection, shall be considered to be acting under color of Federal authority for purposes of determining the liability, and immunity from suit, of the officer or employee in a civil action brought under Federal or State law." 8 U.S.C.A. § 1357(g)(8).

13

law supports such an imputation.[18] To the contrary, the weight of authority demonstrates that a detention solely based upon an immigration detainer issued at the behest of a federal immigration officer is attributable to ICE.

At least one federal court in this circuit has recognized that the issuance of an immigration detainer constitutes a custodial seizure when it is the sole reason for an arrest by local law enforcement. In *Galarza v. Szalczyk*, plaintiff Ernesto Galarza was a United States citizen born in New Jersey. No. 10-cv-06815, 2012 WL 1080020, at *4 (E.D. Pa. March 30, 2012) (vacated and remanded on other grounds). He was arrested by an Allentown (PA) police officer on drug charges. *Id.* at *6. As in this case, the local officer called and cooperated with ICE immigration officials for the purposes of determining Galazra's immigration status, and an ICE official issued an immigration detainer for Galarza. *Id.* at *6-7. Solely as a result of the immigration detainer, Galarza was held at the Lehigh County Prison over the weekend. *Id.* at *7-8. The court concluded that the ICE officer who issued the detainer had seized Galarza and taken

---

[18] In fact, reasonable minds could vigorously debate whether Officer Bienemann was himself acting as a federal government "employee" for purposes of FTCA liability when he detained Davila at Agent Tetrault's direction. The Court need not and does not reach this issue. But it is worth noting that when it enacted the FTCA, Congress chose to extend the definition of a government "employee" beyond the formal employer-employee relationship. *See* 28 U.S.C. § 2671. The FTCA thus waives sovereign immunity not only for torts committed by government employees, but also for "persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation." *Id.* "The use of the word 'includes' in the definition suggests that persons not clearly within the scope of these three categories may nonetheless be covered by the term." *Dumansky v. United States*, 486 F. Supp. 1078, 1090 (D.N.J. 1980). The Supreme Court has summarized the import of all this quite nebulously: "the language is designed to cover special situations such as the 'dollar-a-year' man who is in the service of the Government without pay, *or an employee of another employer who is placed under direct supervision of a federal agency pursuant to contract or other arrangement*." *Logue v. United States*, 412 U.S. 521, 531 (1973) (emphasis added). The Third Circuit has suggested that the actions of local police officers may in some circumstances form the basis of a claim against the United States if the record demonstrates that their actions were "taken on behalf of the federal government." *Couden v. Duffy*, 446 F.3d 483, 499 (3d Cir. 2006). It is clear, for example, that when local police officers have been deputized as federal officers, their actions can support claims against the United States under the FTCA. *See Provancial v. United States*, 454 F.2d 72, 75 (8th Cir. 1972); *Chin v. Wilhelm*, 291 F. Supp. 2d 400, 403 (D. Md. 2003). But the mere assistance of a federal employee in enforcing federal law does not transform a local officer into a federal employee. *Locke v. United States*, 215 F. Supp. 2d 1033, 1038-39 (D.S.D. 2002). The Eastern District of Pennsylvania has suggested there is some middle ground between these two extremes. The actions of a local police officer who knocked out the plaintiff's teeth could, in theory, support an FTCA claim against the United States if evidence were presented that such injuries were "proximately caused by the actions of [a] United States employee." *Belcher v. United States*, 511 F. Supp. 476, 481 n.4 (E.D. Pa. 1981).

14

him into custody within the meaning of the Fourth Amendment. *Id.* at \*10. Although "almost all of the circuit courts considering the issue have determined that the lodging of an immigration detainer, *without more*, is insufficient to render someone in custody," in Galarza's case, just as here, there was "something more"—he "would have been released . . . but for the immigration detainer issued by" the ICE official. *Id.* (citations omitted). The court therefore concluded that the ICE officer's actions caused Galarza's seizure. *Id.* at \*10, 12.

Courts in other circuits have held that detentions at the behest of a federal immigration officers solely based upon immigration detainers can give rise to the United States' liability for false imprisonment and false arrest under the FTCA where such extension of liability is supported by state law. In *Vargas Ramirez v. United States*, for example, plaintiff Gustavo Vargas was pulled over by a local police officer for failing to signal a left turn. 93 F. Supp. 3d 1207, 1213 (W.D. Wash. 2015). Just as in this case, the officer was able to obtain Vargas' driver's license, registration, and insurance. *Id.* While the officer was processing Vargas' documents, he noticed that Vargas' Social Security number showed as all zeros. *Id.* At the request of a federal border patrol agent, the officer detained Vargas and transported him to the police station. *Id.* at 1214. In analyzing Vargas' false arrest and false imprisonment claims, the court applied Washington law, which allows for false arrest or false imprisonment even if the actor did not personally restrain the plaintiff. *Id.* at 1227-28. The Court concluded the United States was liable for false arrest and false imprisonment of Vargas under the FTCA and granted summary judgment in Vargas' favor on those grounds. *Id.* at 1228-29.

In *Morales v. Chadbourne*, plaintiff Ada Morales was a Guatemalan-born United States citizen. 2017 WL 354292, at \*1. She possessed both a social security number and a United States passport. *Id.* Morales was nevertheless held at a state prison solely on the authority of an ICE

immigration detainer. *Id.* at *3. The court concluded that although ICE agents "did not physically detain Morales" because "they expected the [local law enforcement] to do that," they nevertheless were "responsible for the natural consequences of [their] actions"—her detention. *Id.* at *12. The court granted summary judgment in favor of Morales, holding the United States liable for her false imprisonment under the FTCA. *Id.* at *11-13.

In *Uroza v. Salt Lake County*, plaintiff Enrique Uroza, a 22-year-old college student, was held in state custody for thirty-six days based on the issuance of an ICE immigration detainer after he had posted bail on state charges. No. 11-cv-713, 2013 WL 653968, at *1-2 (D. Utah Feb. 21, 2013). The court applied Utah tort law, which allows claims for false imprisonment even if the defendant did not personally take the plaintiff into custody. *Id.* at *8. Uroza successfully stated a claim for false imprisonment against the United States under the FTCA for his detention by state officials based on the ICE immigration detainer. *Id.*

Our Court of Appeals has not held to the contrary. On appeal in *Galarza v. Szalczyk*, the Third Circuit concluded that the issuance of an immigration detainer under 8 C.F.R. § 287.7 was not a mandatory command to local law enforcement officers that they take custody of an alien. 745 F.3d 634, 645 (3d Cir. 2014). Instead, the regulation "authoriz[es] only requests that state and local law enforcement agencies detain suspected aliens subject to removal." *Id.* The *Galarza* court thus reversed the district court's judgment dismissing the plaintiff's complaint against Lehigh County, reasoning that the County could not "use as a defense [the fact] that its own policy did not cause the deprivation of Galarza's constitutional rights" because the County "was free to disregard the ICE detainer." *Id.* at 645. But *Galarza* does not stand for the proposition that the United States can shift potential liability for arrests conducted at the behest of its immigration officers or solely based upon the issuance of federal immigration detainers onto local

municipalities simply because such detainers "ask," rather than "order," local law enforcement to do the United States' detention work. As the court in *Morales* sensibly observed, "[t]he United States and its officials cannot induce state agencies to act [by the issuance of an immigration detainer] and then disclaim their responsibility for the desired results." 2017 WL 354292, at *12.

Accordingly, the Court concludes that Davila has sufficiently pled her detention by Officer Bienemann is attributable to Agent Tetrault for the purposes of supporting claims of false arrest and false imprisonment against the United States despite the fact that Bienemann physically took her into custody.

**2.**

The Court must next determine whether Agent Tetrault's request that Officer Bienemann detain Davila was lawful. The parties agree that Tetrault acted without a warrant and her authority was therefore limited by 8 U.S.C. § 1357(a)(2). ECF No. 16 at 1-2; ECF No. 17 at 2-3; ECF No. 20 at 1-3; ECF No. 21 at 1. That provision states:

> (a) Powers without warrant. Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without warrant . . .
>
> (2) to arrest any alien who in his presence or view is entering or attempting to enter the United States in violation of any law or regulation made in pursuance of law regulating the admission, exclusion, expulsion, or removal of aliens, or to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest, but the alien arrested shall be taken without unnecessary delay for examination before an officer of the Service having authority to examine aliens as to their right to enter or remain in the United States.

8 U.S.C. § 1357. The operative "reason to believe" standard is equivalent to the constitutional probable cause standard. *See Babula v. INS*, 665 F.2d 293, 298 (3d Cir. 1981).

17

The Supreme Court has further expounded upon the authority of immigration officials. "As a general rule, it is not a crime for a removable alien to remain present in the United States." *Arizona*, 132 S. Ct. at 2505. Thus, a stop "based on nothing more than possible removability" lacks "the usual predicate for an arrest." *Id.* Typically, "[w]hen an alien is suspected of being removable, a federal official issues an administrative document called a Notice to Appear. *See* 8 U.S.C. § 1229(a); 8 CFR § 239.1(a) (2012)." *Id.* This "gives the alien information about [removal] proceedings, including the time and date of the removal hearing." *Id.* "The Attorney General," however, "can exercise discretion to issue a warrant for an alien's arrest and detention 'pending a decision on whether the alien is to be removed from the United States.' 8 U.S.C. §1226(a)." *Id.* (citations omitted). And even "[i]f no federal warrant has been issued . . . [immigration] officers . . . may arrest an alien for being 'in the United States in violation of any [immigration] law or regulation,' . . . where the alien 'is likely to escape before a warrant can be obtained.' § 1357(a)(2)." *Id.* at 2506; *see also* 8 C.F.R. § 287.8(c)(2)(i)(ii). Thus, in order to make an arrest without a warrant, an immigration officer must have *both* probable cause to believe that an alien is in violation of an immigration law or regulation *and* probable cause to believe that the alien will likely flee the area before a warrant can be obtained.[19] *See Arizona*, 132 S. Ct. at 2506; 8 C.F.R. § 287.8(c)(2)(i)-(ii); *Babula*, 665 F.2d at 298.

In her Motion for Reconsideration, Davila makes three main arguments for why Agent Tetrault's request that Officer Bienemann detain her was unlawful: first, Davila says, Tetrault lacked authority to do so because Tetrault was not physically present; second, Tetrault did not

---

[19] *See also De La Paz v. Coy*, 786 F.3d 367, 376 (5th Cir. 2015) ("[E]ven if an agent has reasonable belief, before making an arrest, there must also be a likelihood of the person escaping before a warrant can be obtained for his arrest."); *Westover v. Reno*, 202 F.3d 475, 480 (1st Cir. 2000) (finding arrest was "in direct violation" of § 1357(a)(2) because "[w]hile INS agents may have had probable cause to arrest Westover ... there is no evidence that Westover was likely to escape"); *Mountain High Knitting, Inc. v. Reno*, 51 F.3d 216, 218 (9th Cir. 1995) (holding that arrests under § 1357(a)(2) require an individualized determination of flight risk; *United States v. Cantu*, 519 F.2d 494, 496–97 (7th Cir. 1975) (same).

have probable cause to believe Davila was unlawfully present in the United States; and third, Tetrault did not have probable cause to believe Davila was likely to escape before a warrant could be obtained. The Court will address each of Davila's arguments in turn.

**i.**

First, Davila argues that Agent Tetrault lacked the authority under 8 U.S.C. § 1357(a)(5)(A) to request that Officer Bienemann detain Davila because Tetrault was not physically present. The parties now concur that Tetrault's actions should be analyzed under 8 U.S.C. § 1357(a)(2). Davila says she "does not and has never claimed that 8 U.S.C. § 1357(a)(2) has a physical presence requirement." ECF No. 21 at 2 n.2. Nevertheless, for the sake of clarity and because the United States raised arguments on this matter, the Court will address the physical presence issue.

As a textual matter, 8 U.S.C. § 1357(a)(2) does not require an immigration officer's physical presence in order to conduct a warrantless arrest of an alien who is already present in the United States. Although the first clause limits an agent's authority to arrest an alien without a warrant to those aliens entering or attempting to enter the United States "in his presence or view," the second clause, beginning with "or," is not so limited. It only limits an agent's authority to arrest without a warrant an alien who is already in the United States in two ways: (1) the agent must have reason to believe the alien is violation of an immigration law or regulation, and (2) the agent must have reason to believe that the alien is likely to escape before a warrant can be obtained. *Id.*

The Attorney General's implementing regulations contemplate the remote issuance of immigration detainers. "Any authorized immigration officer may at any time issue a[n] . . . Immigration Detainer-Notice of Action[] to any other Federal, State, or local law enforcement

19

agency. A detainer serves to advise another law enforcement agency that the Department seeks custody of an alien presently in the custody of that agency[] for the purpose of arresting and removing the alien." 8 C.F.R. § 287.7(a), (d). The detainer allows immigration officials "to arrange to assume custody[] in situations when gaining immediate physical custody is either impracticable or impossible." 8 C.F.R. § 287.7(a). The regulations impose no physical presence requirement for arrests. "An arrest shall be made only when the designated immigration officer has reason to believe that the person to be arrested has committed an offense against the United States or is an alien illegally in the United States." 8 C.F.R. § 287.8(c)(2)(i). "A warrant of arrest shall be obtained except when the designated immigration officer has reason to believe that the person is likely to escape before a warrant can be obtained." § 287.8(c)(2)(ii).

The Supreme Court's decisions on this point likewise do not impose a physical presence requirement for the warrantless detention of an alien already present in the United States. Where "no federal warrant has been issued, [immigration] officers . . . may arrest an alien for being 'in the United States in violation of any [immigration] law or regulation,' for example, but only where the alien 'is likely to escape before a warrant can be obtained.' § 1357(a)(2)." *Arizona*, 132 S. Ct. at 2506; *see also Reno v. Flores*, 507 U.S. 292, 307 (1993). The Third Circuit's decisions are in accord. *Babula*, 665 F.2d at 297; *Lee v. INS*, 590 F.2d 497, 499 (3d Cir. 1979); *Diogo v. Holland*, 243 F.2d 571, 572 (3d Cir. 1957).

The Court therefore concludes that 8 U.S.C. § 1357(a)(2) does not require an immigration officer's physical presence in order to request the detention of an alien already present in the United States. To the extent it may assert an agent's physical presence is required under 8 U.S.C. § 1357(a)(2), Davila's Motion for Reconsideration will be denied.

**ii.**

Second, Davila argues that Agent Tetrault's request that Officer Bienemann detain her was unlawful under 8 U.S.C. § 1357(a)(2) because Tetrault did not have probable cause to believe Davila was unlawfully present in the United States in violation of an immigration law or regulation. *See* 8 U.S.C. § 1357(a)(2); 8 C.F.R. § 287.8; *Arizona*, 132 S. Ct. at 2506.

The Supreme Court has explained that probable cause is a "fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates,* 462 U.S. 213, 232 (1983). Specifically, the probable cause determination turns on "whether, at the moment the arrest was made . . . the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Beck v. Ohio,* 379 U.S. 89, 91 (1964); *see also Renk*, 641 A.2d at 293 (citing *Commonwealth v. Rodriguez*, 526 Pa. 268 (1991)). Although probable cause "requires more than mere suspicion," it "does not require that the officer have evidence sufficient to prove guilt beyond a reasonable doubt." *Orsatti v. New Jersey State Police*, 71 F.3d 480, 482-83 (3d Cir. 1995). Indeed, probable cause may be found "even in the absence of the actual observance of criminal conduct when a prudent observ[er] would reasonably infer that a defendant acted illegally." *United States v. Burton*, 288 F.3d 91, 98 (3d Cir. 2002). "[I]nnocent behavior frequently may provide the basis for a showing of probable cause." *Gates*, 462 U.S. at 243 n.13.

So what did Agent Tetrault know at the time? When Davila was pulled over, Davila handed Officer Bienemann her driver's license, proof of vehicle registration, and proof of vehicle insurance. Bienemann then relayed Davila's name and date of birth to Tetrault, and

Bienemann informed Tetrault that Davila possessed a Pennsylvania driver's license, which listed her residence as West Mifflin, a suburb of Pittsburgh (PA). Davila then spoke to Tetrault on the phone and provided Tetrault her name, date of birth, address, and cell phone number. Davila told Tetrault that she was born in Mexico but she had lived in the United States for many years. ECF No. 1 at 6-7; No. 13-cv-70, ECF No. 138 at 7. Tetrault asked Davila if she had a visa, and Davila mistakenly told Tetrault that she was a lawful permanent resident rather than a citizen. Tetrault asked Davila whether Davila had her lawful permanent resident card with her, which is required of aliens age eighteen or older. *See* 8 U.S.C. § 1304(e). Davila responded that she did not. Tetrault also knew the results of the initial IAQ for Davila and her passenger, Garrete. ECF No. 1 at 6. Davila was listed as "out of status" and there was "no match found" for Garrete. *Id.*

In hindsight, both Davila's assertion that she was a lawful permanent resident and ICE's initial IAQ results were incorrect—the United States does not dispute that Davila was a citizen and had been for about a decade. But Agent Tetrault did not have the benefit of hindsight. Tetrault may have been entitled to rely on the information alien query results passed to her by Agent Kenwood and Specialist Hayhurst, her fellow ICE officers. *See Commonwealth v. Cooper*, No. 244-mda-2016, 2016 WL 6962116, at *3 (Pa. Super. Ct. Nov. 29, 2016) "It is well-settled that a police officer may validly rely on information related by a fellow officer in effectuating a seizure." *Id.* Such officer "need not have personal knowledge of the facts justifying the seizure." *Id.* (citing *Commonwealth v. Chernosky*, 874 A.2d 123 (Pa. Super. 2005); *United States v. Hensley*, 469 U.S. 221 (1985)). Kenwood and Hayhurst likewise may have been entitled to rely on the initial results of the IAQ. Information from a search database that later turns out to be inaccurate can nevertheless supply an officer with probable cause. *See Com v. Riley*, 425 A.2d 813, 816 (Pa. Super. 1981). This holds true so long as "the arresting officer did not know, and

22

could not reasonably be expected to have known, that the information was wrong when he made the arrest." *Id.*

Ultimately, however, the Court concludes that further factual development is warranted on this issue. On one hand, the "out of status" result from the immigration status search—coupled with Davila's answers to Agent Tetrault's questions and her lack of proper immigration documentation (based on her mistaken assertion at the time that she was a lawful permanent resident rather than a citizen)—could have been a reliable indication that Davila was unlawfully present in violation of an immigration law or regulation and/or deportable.[20] That Davila possessed a Pennsylvania driver's license may have been some evidence of her lawful presence, but as the Court has recognized before, it was far from conclusive; Pennsylvania issues licenses to aliens who are currently involved in removal or deportation proceedings.[21]

On the other hand, an individual who is listed as "out of status" may nevertheless be lawfully present in the United States, just as Davila was. *See Texas*, 787 F.3d at 774-75. It could be the case that a reasonable immigration official would not rely on an "out of status" search result in these circumstances to request a suspect's detention without conducting further investigation, or that a reasonable immigration official would have credited Davila's claim to

---

[20] *See, e.g.*, 8 U.S.C. §§ 1186a; 1227(a)(1)(C)(i); 1304(e); 1325; *Texas v. United States*, 787 F.3d 733, 774-75 (5th Cir. 2015) (while lawful status would imply a right protected by law, lawful presence simply reflects an exercise of discretion by a public official in allowing an alien to remain); *United States v. Quintana*, 623 F.3d 1237, 1241 (8th Cir. 2010) (stop of a Mexican national who claimed to be in the country legally but had no legitimizing immigration documents gave rise to probable cause to arrest under 8 U.S.C. §1357(a)(2)); *Laoye v. Attorney General of United States*, 352 F. App'x 714, 715-17 (3d Cir. 2009) (an "out of status" student, for example, is deportable); *United States v. Rana*, 944 F.2d 123, 125 (3d Cir. 1991) ("A person classified as out of status is subject to deportation."); *Dastmalchi v. INS*, 660 F.2d 880, 890 n.24 (3d Cir. 1981) (an alien who is out of status under applicable immigration-related status and regulations is clearly deportable); *see also United States v. Elenes-Lopez*, No. 75-cr-447, 1990 WL 10023717, at *1, 3 (D. Ariz. Sept. 19, 1990); *Mshihiri v. Holder*, 753 F.3d 785, 790 (8th Cir. 2014); *Suarez v. Mukasey*, 286 F. App'x 966, 968 (9th Cir. 2008); *Partible v. INS*, 600 F.2d 1094, 1096-97 (5th Cir. 1979).

[21] *See, e.g.*, Pennsylvania Department of Transportation Fact Sheet: Identification and Legal Presence Requirements for Non-United States Citizens, http://www.dot.state.pa.us/Public/DVSPubsForms/BDL/BDL%20Publications/pub%20195nc.pdf (last accessed March 23, 2017).

lawful status in these circumstances because she was carrying her driver's license. Subsequent queries—apparently from the very same database that indicated Davila was "out of status" just hours before—showed that Davila had multiple "A-numbers," which are issued by the Department of Homeland Security to an individual when she becomes a lawful permanent resident of the United States or attains other lawful, non-citizen status.[22] These search results led ICE to request Davila's release. *See* No. 13-cv-70, ECF No. 112-5 at 7; *Davila I*, 979 F. Supp. 2d at 637-39.

In the Court's view, at least the following factual issues remain which may be probative regarding whether an ICE agent in Agent Tetrault's shoes had probable cause to believe Davila was unlawfully present in the United States in violation of an immigration law or regulation: (1) exactly what Tetrault knew at the time (including all of the questions she asked Davila and Davila's answers to such questions); (2) the weight properly given by immigration officers to state identification cards in Pennsylvania; (3) the typical meaning(s) of Davila's various immigration status results; (4) when those results were known and when they were communicated to Tetrault; (5) the usual import of such conflicting results in the determination of a person's immigration status; (6) the general accuracy and reliability of such immigration records as used by ICE; and (7) the reasonable impact of such conflicting information on an agent's determination as to a particular record or records' consequence or reliability.

Accordingly, upon reconsideration, the Court concludes that factual issues prevent it from holding as a matter of law that Agent Tetrault had probable cause under 8 U.S.C.

---

[22] In all, subsequent searches turned up three additional A-numbers: one listing Davila as "family fairness granted," a status which provides for relief from removal and authorizes a legal permanent resident's spouse or unmarried child to be employed; a second listing Davila as "family fairness denied"; and a third listing Davila as status IR-7, a classification used for legal permanent residents who are children of a U.S. citizen. *See* No. 13-cv-70, ECF No. 112-5 at 7.

24

§ 1357(a)(2) to believe Davila was unlawfully present in the United States in violation of an immigration law or regulation. *See* § 1357(a)(2); 8 C.F.R. § 287.8; *Arizona*, 132 S. Ct. at 2506.

### iii.

Finally, Davila argues that Agent Tetrault did not have probable cause under 8 U.S.C. § 1357(a)(2) to believe Davila was likely to escape before a warrant could be obtained. *See* 8 U.S.C. § 1357(a)(2); 8 C.F.R. § 287.8; *Arizona*, 132 S. Ct. at 2505-07.

In an earlier Opinion in this case, the Court explained the likelihood-of-escape limitation 8 U.S.C. § 1357(a)(2) places on an ICE official's authority. *See* No. 13-cv-70, ECF No. 84 at 26-30. "Federal immigration officers are authorized by statute to make a warrantless arrest of an alien 'if they have reason to believe that the alien so arrested is in the United States in violation of any such law or regulation [regulating the admission, exclusion, expulsion, or removal of aliens] and is likely to escape before a warrant can be obtained for his arrest.'" No. 13-cv-70, ECF No. 84 at 26 (citing 8 U.S.C. § 1357(a)(2)). The Court characterized the issue of "whether Agent Tetrault had probable cause to believe that Davila would flee before a warrant was obtained" as a "close[] call." No. 13-cv-70, ECF No. 84 at 29. The Court noted that the Third Circuit has provided little guidance as to when this prong of probable cause exists. *Id.* The Court then weighed the facts at hand, ultimately stating that "it is not certain . . . whether Agent Tetrault possessed the requisite probable cause to issue an immigration detainer" on 8 U.S.C. § 1357(a)(2) grounds. *Id.* The Court ultimately concluded that Tetrault was entitled to qualified immunity due in large part to the lack of clarity of decisional law in those regards. *Id.* at 29-30. But the Court did not definitively reach a legal conclusion as to whether Tetrault had probable cause to believe that Davila was likely to escape before a warrant could be obtained. *See id.*

Because the meaning of "likely to escape before a warrant can be obtained" is both a question of federal statutory interpretation and a highly a fact-intensive inquiry, federal decisional law guides the Court's analysis. The likelihood-of-escape limitation is "seriously applied." *Cantu*, 519 F.2d at 497 (citing *Diogo v. Holland*, 243 F.2d 571 (3d Cir. 1957)). It "is not mere verbiage. The Supreme Court held officers to this constraint in *Arizona*. There, the Court found that Arizona's enforcement statute was preempted because it purported to give Arizona law enforcement unlimited warrantless arrest authority, exceeding ICE's own warrantless arrest authority, which is limited to situations when there is a likelihood of escape before a warrant can be obtained." *United States v. Pacheco-Alvarez*, No. 16-cr-140, 2016 WL 7475652, at \*18 (S.D. Ohio Dec. 29, 2016) (citing *Arizona*, 132 S. Ct. at 2505-07) (citations omitted).

A review of the factual circumstances in which other courts have reached a probable cause determination regarding § 1357(a)(2)'s likelihood-of-escape limitation is instructive. In *Cantu*, an informant reported to immigration officials that Agapita Cantu and two companions, all United States citizens, were planning to help illegal aliens enter the United States and relocate to the Midwest. 519 F.2d at 495. The informant provided details about the operation that turned out to be correct, including the make and model of the car that Cantu would use and the route that she would take. *Id.* When immigration officers pulled over Cantu's vehicle, they found six Mexican citizens illegally present in the United States. *Id.* Cantu, her companions, and all of the passengers were arrested. *Id.* The court characterized the question of whether Cantu was likely to escape before a warrant could be obtained as "troublesome." *Id.* at 496. On one hand, immigration authorities knew of Cantu's plan days ahead of time, were privy to her exact route into the country, and knew where she was headed. *Id.* at 497. On the other hand, it was arguably

26

only after pulling Cantu over and seeing the illegal aliens that authorities had probable cause to arrest her for an immigration violation. *Id.* The court ultimately found that the likelihood of escape was a serious threat. There was already good evidence that Cantu was committing a felony; she was "highly mobile," "travel[ing] a heavily-trafficked interstate highway system at high speeds and for a great distance," and her exact destination was "not entirely predictable." *Id.* at 497-98. Courts have reached the same conclusion where an alien "attempt[ed] to evade custody," *Contreras v. United States*, 672 F.2d 307, 309 (2d Cir. 1982), "was looking for an opportunity to run," *United States v. Meza-Campos*, 500 F.2d 33, 34 (9th Cir. 1974), or was speeding cross-country in a car that belonged to someone else. *United States v. Quintana*, 623 F.3d 1237, 1238 (8th Cir. 2010).

In *United States v. Khan*, defendant Imran Khan, a Pakistani national, immigrated to the United States unlawfully when his adoptive parent, a United States citizen, falsely claimed him as a child born in wedlock. 324 F. Supp. 2d 1177, 1180 (D. Colo. 2004). When Khan was in his twenties, an FBI agent and an ICE agent grew suspicious of his immigration status and traveled to Petaluma, California, to interview him as a suspect for prosecution. *Id.* at 1180-81. They lured him out of his apartment, identified themselves as "FBI," and questioned him about his immigration status. *Id.* at 1181. Khan cooperated, inviting the agents inside. Eventually, the agents suggested that they get in the car. There, the agents continued questioning Khan about his immigration status for one and a half to two hours. *Id.* Then, they arrested Khan without a warrant. *Id.* at 1182. The court concluded that the government had not shown Khan was likely to escape. Khan was listed as a permanent resident. *Id.* at 1187. He knew that the FBI and ICE were investigating his family's immigration status, but he believed himself to be legally present. *Id.* Khan had two jobs, owned a vehicle, and was paying rent. *Id.* He had no criminal record. *Id.*

Although Khan had moved away from his family, there was no evidence beyond mere speculation that showed he was prone to flee. *Id.*

In *Araujo v. United States*, plaintiff Jose Araujo, a Mexican citizen, came to the United States illegally in 1979. 301 F. Supp. 2d 1095, 1097 (N.D. Cal. 2004). He was caught by immigration authorities and deported in 1983. *Id.* Shortly thereafter, Araujo came to the United States illegally again, and in 1996, he married Maria Araujo, a United States citizen. *Id.* Araujo then filed an application to become a lawful permanent resident. *Id.* In response, immigration officers arrested Araujo at his home without a warrant. *Id.* The court held that there was no evidence that Araujo was likely to escape before a warrant could be obtained. *Id.* at 1101-02. Araujo was living with his wife and had filed an application to become a lawful permanent resident. *Id.* at 1102. The United States had plenty of time to obtain a warrant before affecting an arrest. *Id.*

This case is somewhere in between. The government has pointed to little or no evidence that Davila likely to escape before a warrant could be obtained. True, Davila was in a vehicle and she informed Agent Tetrault that she was born in Mexico. But Davila was not traveling at high speeds across vast distances on an interstate highway. Nor is there any evidence that she was attempting to evade the inquiry into her immigration status, that she was anywhere near the border, or that she was headed in that direction. To the contrary, Davila pulled out of a grocery store parking lot after a routine shopping trip. When questioned, Davila stated her belief that she was a lawful permanent resident. Although not in possession of her lawful permanent resident card, Davila stated that she and her parents legally immigrated to the United States many years ago and had lived here ever since. To support that claim, Davila presented a Pennsylvania driver's license showing her Pennsylvania address, proof of ownership and insurance for her car.

Even if Davila's status had expired, her presence in the United States was not itself a crime. *See Arizona*, 132 S. Ct. at 2505. Her "out of status" result indicated that she was, at the very least, in the immigration system, and she had at some point moved to the United States possessing lawful status. There is no record evidence that Davila began to act nervous, that she showed signs of running, or that she would avoid further inquiry into her immigration status; to the contrary, Davila willingly assisted ICE and the police as an interpreter during their nearly two hour roadside interrogation of Garrete. So while it is certainly *possible* that Davila could have made a run for it, that does not mean an ICE agent in Tetrault's shoes would have had probable cause to believe it "likely" as a matter of law—whether in light of the limited information Tetrault had, or perhaps because the information she had was so limited. *See* 8 U.S.C. § 1357(a)(2).

In light of the facts Davila alleges, the Court declines to hold as a matter of law that an immigration officer in this situation would have probable cause to believe that Davila was likely to escape before a warrant could be obtained. The facts just as easily suggest that Agent Tetrault could have obtained a warrant at some time during the two hours Davila was on the side of the road, or that ICE could have later obtained a warrant and served it on Davila at her home address. That said, the Government's dearth of evidence at this early stage of the case does not conclusively establish that Tetrault lacked probable cause to believe that Davila was likely to escape before a warrant could be obtained. Further discovery might reveal that Tetrault asked Davila a specific series of questions or took some other steps to reach a flight-risk determination, or that an immigration officer looking at IAQ results like Davila's might for some other reason have had sufficient grounds to believe she would take flight.

Accordingly, upon reconsideration, the Court concludes that factual issues prevent it from holding as a matter of law that Agent Tetrault had probable cause under 8 U.S.C.

§ 1357(a)(2) to believe Davila was likely to escape before a warrant could be obtained. *See* 8 U.S.C. § 1357(a)(2); 8 C.F.R. § 287.8; *Arizona*, 132 S. Ct. at 2506.

## IV.   CONCLUSION

Davila's Motion for Reconsideration, ECF No. 16, is GRANTED. The Court's dismissal Order, ECF No. 15, is VACATED to the extent it dismissed the false arrest and false imprisonment claims against the United States.[23] The United States will remain a defendant in No. 14-cv-70 as to those claims.

An appropriate Order will issue.

Mark R. Hornak
United States District Judge

Dated: March 28, 2017

cc:    All counsel of record

---

[23] The Court's holdings as to each of the probable cause issues under 8 U.S.C. § 1357(a)(2) do not alter its earlier ruling that Agent Tetrault is entitled to qualified immunity as to Davila's claims against Tetrault in her individual capacity for damages in No. 13-cv-70. *Davila I*, 979 F. Supp. 2d at 637-39; No. 13-cv-70, ECF No. 84 at 28-30. Although it may turn out that Tetrault was mistaken regarding her authority to request Davila's detention, qualified immunity protects Tetrault from liability for such a mistake unless every reasonable official would have understood that his or her action amounted to a violation of a clearly established statutory or constitutional right. *See Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012); *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011). The bar is high: "existing precedent must have placed the statutory or constitutional question beyond debate." *Al-Kidd*, 563 U.S. at 741. The Supreme Court has repeatedly cautioned courts "not to define clearly established law at a high level of generality." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015). "The dispositive question is 'whether the violative nature of particular conduct is clearly established.'" *Id.* "This inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Id.* Here, given the fact-intensive nature of each inquiry and in light of a considerable and long-standing split of federal authority on such issues in cases bearing at least some factual resemblance to this one, the Court concludes that no existing precedent clearly established that an immigration official who concluded he or she had probable cause as to each issue based upon the information Tetrault is alleged to have had available to her at the time was violating federal law such that the question would have been "beyond debate."